UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| APEX DIGITAL, INC. | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 09 C 1452 |
| SEARS, ROEBUCK AND CO., | ) Judge John W. Darrah |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

On March 6, 2009, Plaintiff Apex Digital, Inc. ("Apex") filed a four-count Complaint against Defendant Sears, Roebuck and Co. ("Sears"), stemming from an alleged breach of contract by Sears. This case was previously before Judge Lindberg, who granted summary judgment in favor of Sears on Counts II through IV of Apex's Complaint. After this case was transferred to this Court, leave was granted for the parties to file successive motions for summary judgment. Now pending before the Court is Sears' Motion for Summary Judgment as to Count I of Apex's Complaint. Apex has filed a Cross-Motion for Summary Judgment, which appears to be directed at portions of Count I.

## BACKGROUND[1]

The following facts are taken from the Parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[2]

Apex is a California corporation with is principal place of business in California. (Def.'s 56.1(a)(3) ¶ 1.) Sears is a New York corporation with its principal place of business in Illinois. (*Id.* ¶ 2.) The amount in controversy, exclusive of interest and costs, is in excess of $75,000.00. (*Id.* ¶ 3.) This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), and venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a).

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(b)(3)(B) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). Under Local Rule 56.1(b)(3)(C), the nonmoving party may file a statement of additional facts and the moving party may submit a concise reply under Local Rule 56.1(a)(3).

[2] Apex has failed to properly dispute Sears' statement of facts in support of its motion for summary judgment. Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny each factual statement proffered by the moving party. In the case of disagreement, Local Rule 56.1(b)(3)(B) requires the nonmoving party to cite "*specific* references to the affidavits, parts of the record, and other supporting material." Local Rule 56.1(b)(3) (emphasis added); *see Richards v. Combined Ins. Co. of America*, 55 F.3d 247, 251 (7th Cir. 1995) (observing that non moving party must "identify with reasonable particularity the evidence that precludes summary judgment.").

Although Apex asserts that it denies certain of Sears' statement of facts, Apex fails to cite *any* record evidence in support. (*See, e.g.*, Resp. to Sears' 56.1(a)(3) ¶ 8 (denying factual statement based on Wing Lau's testimony but failing to provide any record citation).) Apex's failure to dispute the facts set forth in Sears' statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

### Universal Terms and Conditions Contract

On September 12, 2003, Apex and Sears entered into the Universal Terms and Conditions agreement ("UTC"). (*Id.* ¶ 5.) Pursuant to the UTC, Sears placed orders for certain goods from Apex and Apex delivered such goods to Sears. (*Id.* ¶ 6.)

The UTC provides that it "shall apply to all Merchandise . . . sold by the undersigned vendor ("Seller") . . . to [Sears]" and "shall apply to, and is incorporated into, all other Vendor Agreements." (Pl.'s 56.1(b)(3) ¶ 1.) The UTC defines "Vendor Agreement" as "any written agreement between Sears and Seller relating to Merchandise, including, without limitation, this UTC, all Purchase Orders advertising, point of sale, promotional service, promotional funding or other selling assistance agreements, buying or supply agreements, exclusivity agreements, letters of agreement, and any written amendments, waivers and consents relating to any of the foregoing." (*Id.* ¶ 2.) This definition does not include invoices.

Section 2.2 of the UTC provides that the Vendor Agreements "contain the entire understanding of Seller and Sears with respect to the subject matter of such Vendor Agreements and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any responses by Seller, whether oral or written, purporting to modify or supplement the terms of a Purchase Order or other Vendor Agreement unless such response is in writing and executed or consented to in writing by Sears." (*Id.* ¶ 6.) Section 2.2 further provides that, "All Purchase Orders and other Vendor Agreements shall be deemed a series of installments in one and the same transaction and deemed to constitute a single agreement between

Sears and Seller within the meaning of Section 9-404(a) of the UCC [Uniform Commercial Code]." (Def.'s Resp. to Pl.'s 56.1(b)(3) ¶ 7.)

*Apex's Invoice Report*

Apex's Complaint alleges that Sears failed to pay it $12,147,599.76 in invoices. (Def.'s 56.1(a)(3) ¶ 7.) The $12,147,599.76 figure in Apex's Complaint was derived from Apex's Aged Open Invoice Report, which contained $15,108,074.55 of positive dollar entries and $2,960,474.79 of merchandise return credits, for a "net" positive dollar figure of $12,147,599.76. (*Id.* ¶ 8.) Against the "net" positive dollar figure of $12,147,599.76, Apex alleged in its Complaint that Sears is entitled to credits totaling $3,962,297.52. (*Id.* ¶ 9.) Therefore, Apex's Complaint alleges that after applying the credit to which Apex claims Sears is entitled, there is a balance due of $8,185,302.24. (*Id.*)

Apex's Aged Open Invoice Report lists the following three "Types" of entries: "CB-D," "CHAR," and "INVO." (*Id.* ¶ 10.) "CB-D" and "CHAR" mean "charge-back deductions" (also referred to as "charge-backs"). (*Id.*) "Charge-back deductions" were entries that were created by Apex when Sears, in paying Apex's invoices, took a deduction with which Apex disagreed . (*Id.* ¶ 11.) "INVO" means invoice; some of the "INVO" entries are for unpaid invoices and some are for charge-back deductions. (*Id.* ¶ 12.) The "INVO" entries on the Aged Open Invoice Report that have identical order and invoice numbers are "charge-back deductions." (*Id.* ¶ 13.)

The total dollar amount of charge-backs listed on the Aged Open Invoice Report is $11,940,758.05. (*Id.* ¶ 14.) This breaks down as follows: total dollar amount of

charge-backs listed on the Aged Open Invoice Report under the "CB-D" category is $3,382,148.66; the total dollar amount of charge-backs listed on the Aged Open Invoice Report under the "CHAR" category is $3,443,692.25; and the total dollar amount of charge-backs listed on the Aged Open Invoice Report under the "INVO" category is $5,114,917.14. (*Id.* ¶¶ 15-17.) All of the "CB D," "CHAR," and "INVO" charge-back entries were created in or prior to December 2004. (*Id.* ¶ 18.) The latest posted charge-backs listed by Apex on its Aged Open Invoice Report were posted by Apex on December 21, 2004. (*Id.* ¶ 19.)

*Payment Terms of Apex's Invoices*

Pursuant to the UTC's terms, Apex would send electronic invoices to Sears for the goods it delivered. (*Id.* ¶ 20.) The payment terms of Apex's invoices to Sears were "Net 60," referring to the stated payment due date, which is calculated by adding 60 days to the date on the invoice. (*Id.* ¶¶ 21-22.)

When some of the basic terms of the relationship between Sears and Apex were memorialized electronically through the Sears Business Exchange, the "payment terms" were set forth as "Net 60 Receipt of Goods." (*Id.* ¶ 24.) According to Sears' vendor database settings, effective as of February 6, 2002, the terms of all of Apex's invoices were "N/60 ROG." (*Id.* ¶ 25.) Upon receipt of an invoice from Apex, the Sears accounts payable system (Invoice Processing System) confirmed the terms of the invoice and the invoice would be put into the A/P pending file and paid based on the aforesaid "N/60 ROG" terms. (*Id.* ¶ 26.) The "Net 60" term was set forth on an internal Apex

"Special/Non-Standard Pricing Request" and a "Letter of Agreement" executed by the parties. (*Id.* ¶ 27.)

*November 9, 2004 Invoices*

On November 9, 2004, Apex transmitted Invoice Numbers 159522, 159523, 159548, 159550 and 159551 to Sears (the "November 9, 2004 Invoices"). (*Id.* ¶ 28.) The November 9, 2004 Invoices are the latest dated Apex invoices listed by Apex in its discovery responses as being outstanding. (*Id.* ¶ 29.) The November 9, 2004 Invoices were the latest dated invoices that Sears received for goods that it purchased and received from Apex. (*Id.* ¶ 30.)

The terms of the November 9, 2004 Invoices were "Net 60." (*Id.* ¶ 31.) Under the "Net 60" provision, the November 9, 2004 Invoices were due 60 days after their transmittal date (November 9, 2004), which is January 8, 2005. (*Id.* ¶ 32.) Apex's accounting records showed the November 9, 2004 Invoices as being due on January 8, 2005, exactly 60 days after their issue date. (*Id.* ¶ 33.)

Under the UTC, Apex expected the November 9, 2004 Invoices would be paid within 60 days or by January 8, 2005. (*Id.* ¶ 34.) All of the other Apex invoices for goods that Sears purchased and received from Apex pre-date the November 9, 2004 Invoices. (*Id.* ¶ 35.)

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the

court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz*, 67 F.3d at 596 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal citation omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

## ANALYSIS

### *Sears' Motion for Summary Judgment*

Sears argues that Apex's breach-of-contract Count I claims are barred by the four-year statute of limitations set forth in Section 2-275 of the Illinois Uniform Commercial Code ("IL-UCC"). 810 ILCS 5/2-725. Apex disagrees, arguing that the amounts in question could not have been due earlier than January 2006, which is less than four years when from the Complaint was filed on March 6, 2009.[3]

---

[3] Apex's memoranda opposing Sears' Motion and in support of Apex's Cross-Motion do not cite to specific paragraphs of the statement of facts. Instead, Apex improperly cites directly to evidentiary exhibits. "Citing directly to the record in the memorandum . . . rather than citing to its 56.1(a)(3) statement, negates the purpose of the summary judgment exercise . . . The court should be spared from engaging in this type of

7

The parties agree that the IL-UCC applies to the contract at issue and, thus, that the four-year statute of limitations imposed by the IL-UCC applies. Section 2-275(1) provides that, "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued." 810 ILCS 5/2-725(1). Section 2-275(2) provides, "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." 810 ILCS 5/2-725(2).

In other words, any viable cause of action for failure to pay the total invoice amount accrued when Plaintiff could have legally demanded payment of the total invoice from Sears. "A cause of action accrues and the statute of limitations begins to run when a creditor may legally demand payment from a debtor." *Kozasa v. Guardian Elec. Mfg. Co.*, 425 N.E.2d 1137, 1142 (Ill. App. Ct. 1981).

The heart of the dispute is when the alleged breach-of-contract claims "accrued." Sears argues that Apex's claims are based on discrete transactions, which all accrued more than four years before Apex filed its Complaint. Apex argues that the UTC made Sears' payment obligations "open" and were thus part of a continuous transaction in which returns were being made and processed less than four years before Apex filed suit. Apex's breach-of-contract claim is broken down into two different categories of payment, as follows: the charge-back deductions and unpaid invoices.

First, as to the charge-back deductions, the undisputed facts demonstrate that $11,940,758.05 of the amount that Apex claims is due can be attributed to charge-back

---

guesswork. The aim of a 56.1(a)(3) statement is to organize the arguments, give the [nonmovant] an opportunity to respond, and economize court resources by lessening the need to 'scour the record.'" *Daoust v. Abbott Labs.*, No. 05 C 6018, 2006 WL 2711844, at *2 (N.D. Ill. Sept. 19, 2006).

entries on Apex's Aged Open Invoice Report that date from 2002 up until December 21, 2004. Furthermore, the undisputed facts demonstrate that Apex created the charge-back entry in its system when it did not agree with a deduction taken by Sears when Sears had otherwise paid the rest of the invoices. Accordingly, the undisputed facts demonstrate that Plaintiff knew in or prior to December 21, 2004, that Sears should not have deducted these specific listed amounts from payments that Sears submitted to Apex.

Apex argues that the proper date of the invoices is in 2006. (Resp. at 3-4.) Specifically, Apex argues that under the UTC, "Sears' payments were advances against a debt yet to be determined [and] the parties understood that Sears had the right to hold open its obligations to pay until the full monetary obligations of Apex were determined." (Resp. at 3.) Apex's argument is contradicted by the plain terms of the UTC, which provides that Sears had the right "at all times, to deduct any of [Apex's] Monetary Obligations from any amounts owed to [Apex] by Sears, and to pay only the net sum due, if any." (Sears' Ex. 3 at §§ 2.1, 9, 15.) Further, Apex's conclusory argument is unsupported by the undisputed facts. The undisputed facts demonstrate that Sears did not make advance payments to Apex; rather, it paid specific invoices when due and took deductions as it deemed appropriate pursuant to the above-mentioned provision of the UTC.

Therefore, as to the $11,940,758.05 in deductions, Apex's March 6, 2009 Complaint was filed more than four years after Apex was aware of each of Sears' specific deductions, the latest of which was part of a payment by Sears to Apex on

December 21, 2004. Sears' Motion for Summary Judgment is granted as to the $11,940,758.05 in charge-backs Apex claims is due in Count I.

Second, Apex argues that Sears owes $3,029,028.00 in unpaid invoices. Sears argues that the undisputed facts show that these invoices were "net 60," meaning that payment was due from Sears 60 days from the date of the invoice.

Apex argues that these invoices were not due 60 days after the date of the invoice, but Apex fails to state *when* payment would actually have been due. Apex argues that Sears is taking the net-60 payment term from an invoice that was not signed by Sears and introducing a materially different term to the UTC. Apex argues that any changes to the UTC must be in writing and, because the invoices were not signed by Sears, the net-60 payment provision is not valid.

Apex's argument is not consistent with the terms of the UTC. The UTC provides that Apex's invoices would be issued electronically and payments would be made by Sears electronically, but the contract does not set forth a specific time for invoices to be paid. (*See* Sears' Ex. 3 § 9.) "Where, as here, an agreement is silent on a particular term, a course of dealing may fill the void." *Capitol Converting Equipment, Inc. v. LEP Transport, Inc.*, 965 F.2d 391, 396 (7th Cir. 1992) (holding that the parties' course of dealing supplemented their oral agreement, which was silent as to defendant's liability to plaintiff); *see also Krueger Intern., Inc. v. Blank*, 225 F.3d 806, 814 (7th Cir. 2000) (where contract was silent regarding what was necessary to allow an entity to exercise a repurchase option, consideration of extrinsic evidence to clarify how and when options

are exercised and exploration of "the parties' conduct or prior understanding might yield some insight into whether [the entity's] actions sufficed to exercise its option").

Allowing the parties' course of dealing to supplement the UTC does not conflict with the terms of the UTC, as Apex argues. Although the UTC states that "Vendor Agreements" may not be supplemented or modified by course of dealing unless such response is in writing and executed or consented to in writing by Sears, the definition of Vendor Agreement expressly does not include invoices.

In fact, if Apex's argument is taken at face value, the due date of payment would be *upon receipt* of the goods – such a position is to the detriment of Apex. Here, because the UTC is *silent* on when invoices are due, the UCC would be used to supplement this term. As Apex itself argues, the UCC provides that payment is due upon delivery of goods. 810 ILCS 5/2-310. Therefore, because Sears' payment would have been due sooner than 60 days past the date of the invoice, the statute of limitations would have begin running at an earlier date.

The undisputed facts demonstrate that Apex's internal accounting entries reflect that payments were due 60 days after the date of the invoice and that when Apex issued invoices from 2002 to 2004, Sears paid the invoices 60 days after the receipt of the goods. Accordingly, here, the parties' course of conduct demonstrates payment was due 60 days after receipt of the goods. *Gord Indus. Plastics v. Aubrey Mfg., Inc.*, 431 N.E.2d 445, 449-50 (Ill. App. Ct. 1982) (course of dealing may supplement contract to supply a mold-removal fee on which contract was silent).

The undisputed facts further demonstrate that amounts from these invoices came due from December 10, 2004 to January 8, 2005 (reflecting dates 60 days past issuance of the invoices). Apex's March 6, 2009 Complaint is, therefore, untimely. Accordingly, Sears' Motion for Summary Judgment is granted as to the $3,029,028.00 in the invoices Apex contends are unpaid. Sears' Motion for Summary Judgment is thus granted as to Count I of Apex's Complaint in its entirety.

*Apex's Motion for Summary Judgment*

In its Cross-Motion, Apex "moves this [C]ourt for summary judgment that Sears is in breach of its contract in that Sears has admittedly failed and refused to pay Apex amounts due for goods that Sears ordered, received and sold to its profit." (Cross-Mot. at 1.) It is not clear, from either Apex's Cross-Motion or Reply brief, what specific relief Apex seeks. The only claim at issue in this litigation is Count I of Apex's Complaint. In light of the Court's ruling, granting summary judgment in favor of Sears on Count I, Apex's Cross-Motion is denied.

## CONCLUSION

For the reasons set forth above, Sears' Motion for Summary Judgment is granted as to Count I of Apex's Complaint. Apex's Cross-Motion for Summary Judgment is denied. Apex's Complaint is hereby dismissed. Civil case is terminated.

Date: August 15, 2012

JOHN W. DARRAH
United States District Court Judge